IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| EDU OFFICE PRODUCTS, INC., trading as D3 TECHNOLOGIES, | * |
| | * |
| Plaintiff, | * |
| v. | * Civil Action No. GLR-20-1264 |
| | * |
| MP COPIERS, INC., | * |
| Defendant. | * |

\*\*\*

# MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiff EDU Office Products, Inc., trading as D3 Technologies (collectively, "EDU") and Defendant MP Copiers, Inc.'s Cross Motions for Summary Judgment (ECF Nos. 53, 54). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will deny EDU's Motion and grant in part and deny in part MP Copiers' Motion.

## I.   BACKGROUND

### A.   Factual Background

Plaintiff EDU Office Products is an office products sales company that was founded by Elliott Krutoy in the 1980s. (See Agreement at 1, ECF No. 53-2; Jeffrey Boomer Dep. ["Boomer Dep."] Vol. 1 at 9:18−10:1, ECF No. 53-3).[1] Defendant MP Copiers is an office equipment supplier led by President Mark Yingling. (See Agreement at 2). On June 13,

---

[1] Citations to exhibit page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system unless otherwise indicated.

2003, Krutoy and Yingling executed a Reaffirmation Agreement (the "Agreement" or "Contract") on behalf of their companies. (Id.). The Agreement provides that:

> *1. All deals sold by Elliott and his crew will be paid at the commission rate of 55% of the profit on the deal; the profit to be calculated using published Summit Level or GEM Level pricing, as applicable. Elliott will not be "charged back" for delivery charges (if delivery charges appear on the sales contract, they will be considered part of the "sale price" and as such, will be taken into account when determining profit).
>
> **2. A service revenue commission of 14% of the revenue received will be paid quarterly.
>
> 3. Protection: Elliott will supply to MP Copiers, Inc. a list of accounts where Elliott and his crew have sold MP Copiers Inc's equipment or had service and or service supply contracts transferred to MP Copiers, Inc. In the event that MP Copiers, Inc should sell to a protected account, Elliott will receive the applicable commission as calculated in Paragraphs 1 and 2 above.

(Id. ¶¶ 1–3). MP Copiers had the right to adjust the commission schedules or cancel the Agreement any time, but "in both cases, residual commissions for past sales such as (but not limited to) service and supply contracts will continue to be paid to Elliott [Krutoy] at the rate that was current when the sale was made." (Id. at 2 (emphasis in original)). Finally, the Agreement expressly bound the parties' respective heirs, successors, and assigns. (Id. at 3).

According to this Agreement, EDU contacted potential customers, processed transactions, and sold equipment, which was delivered by MP Copiers. (See Boomer Dep. Vol. 2 at 74:16–75:15, ECF No. 53-5). EDU then continued to manage customer

relationships by assessing their needs and arranging for equipment servicing, which again was provided by MP Copiers. (Id. at 146:13−18).

On November 25, 2008, Krutoy's business partner Jeffrey Boomer, transacting as D3 Technologies, bought EDU and assumed its vendor contracts, including the Contract with MP Copiers. (See Agreement for Sale of Vendor Contracts ["Vendor Contracts Agreement"] at 3, ECF No. 53-4). EDU, through Boomer, continued to manage Krutoy's accounts. (See Boomer Dep. Vol. 2 at 75:11−21; 146:4−18). In 2013, EDU and MP Copiers agreed that they would only work together on the account for a single customer called Inova. (Yingling Dep. Vol. 1 at 128:12−16, ECF No. 56-2).

MP Copiers fell behind on its commission payments to EDU. (See Feb. 17, 2016 Email at 2, ECF No. 53-9). It paid EDU $40,000 on January 21, 2016, but as of February 17, 2016, it still owed $236,312. (Id.). In an email to Yingling on February 17, 2016, Boomer asked for a $180,000 check. (Id.). On March 2, 2016, Yingling stated that MP Copiers would pay no more than $20,000 per month towards the balance if funds were available. (Mar. 2, 2016 Email at 3, ECF No. 53-10). He also alleged that EDU needed to meet a quota of $800,000 in equipment sales to Inova for the current commission rates to continue. (Id. at 4). Because EDU had not met this quota, MP Copiers could not receive discounted equipment from manufacturers, and thus it needed to adjust EDU's commission amounts on servicing from 12% to 8% to make a profit. (Id. at 4−5). If EDU did not agree to these terms, MP Copiers would pay $10,000 per month towards the balance due if these funds were available. (See id. at 7). Boomer did not agree to the quota or to the 8% servicing fee, but he did agree to accept $10,000 monthly payments moving forward.

3

(Boomer Dep. Vol. 3 at 89:4−15, ECF No. 54-3). In his deposition, Boomer said that he agreed to the $10,000 per month payments despite the fact that it contravened the Agreement because these payments were better than nothing. (Id. at 90:10−21).

MP Copiers alleges that it negotiated the quota with Kutroy in 2002 or 2003 as an oral contract that applied to sales moving forward. (Yingling Dep. Vol. 2 at 75:6−9, ECF No. 53-8). EDU contends that there was no such agreement and that Yingling's email was the first time that MP Copiers mentioned an $800,000 quota and different commission percentages. (See Boomer Dep. Vol. 2 at 40:7−21). EDU had always received 12% in servicing fees in the past and had not been required to meet a quota. (See Yingling Dep. Vol. 2 at 70:15−20). EDU never sold more than $800,000 of equipment a year to Inova or to any one customer. (See generally Inova Account Debts and Payments Spreadsheet ["Spreadsheet"], ECF No. 53-6). Further, EDU was not involved in negotiating pricing with manufacturers—MP Copiers alone determined how much it paid for equipment. (See Boomer Dep. Vol. 3 at 27:8−10; Yingling Dep. Vol. 2 at 32:1−11, 70:6−10).

On May 12, 2016, Inova sent a letter to EDU stating that Inova would no longer purchase equipment from MP Copiers but that it would like to receive servicing on equipment previously purchased from MP Copiers for the next year. (Inova Letter at 2, ECF No. 53-13).

MP Copiers made sporadic payments to EDU between March 2016 and July 2020:

- $20,000 on May 9, 2016
- $20,000 on April 13, 2016
- $20,000 on May 11, 2016
- $5,000 on July 13, 2016
- $5,000 on August 17, 2016

- $10,000 on October 19, 2016
- $10,000 on November 21, 2016
- $10,000 on December 30, 2016
- $10,000 on February 22, 2017
- $10,000 on March 30, 2017
- $10,000 on May 4 and 31, 2017
- $10,000 on September 21, 2017

(Spreadsheet at 6). Despite these payments, MP Copiers still owed approximately $412,202.56 on September 21, 2017 because sales and services continued to be provided in addition to MP Copiers' pre-2016 debt. (See id.). On January 30, 2018, Boomer emailed Yingling to ask for payment. (Jan. 30, 2018 Email at 2, ECF No. 53-14). MP Copiers responded by saying: "The payments stopped because you didn't do the things you were supposed to do, As I told you would happen the last time we met." (Jan. 30, 2018 Reply Email at 2, ECF No. 53-15). On January 31, 2018, Boomer emailed Yingling and reminded him of the Agreement and his obligations to pay commissions accordingly. (Jan. 31, 2018 Email at 2, ECF No. 53-16). Yingling responded by saying that "there was no written agreement with Elliott." (Jan. 31, 2018 Reply Email at 2, ECF No. 53-17). Boomer replied on February 1, 2018 to inform Yingling that as EDU's successor and assign, he and D3 were entitled to enforce the 2003 Agreement. (Feb. 1, 2019 Email at 2, ECF No. 53-18).

**B.     Procedural History**

On February 4, 2020, EDU filed its Complaint in the Circuit Court for Anne Arundel County alleging: breach of contract (Count I); quantum meruit (Count II); and unjust enrichment (Count III). (Compl. ¶¶ 5–33, ECF No. 2). EDU seeks $704,353.30 in damages. (Id. ¶ 14). On May 20, 2020, MP Copiers removed the case to this Court on the basis of

diversity jurisdiction, (Notice of Removal ¶ 1, ECF No. 1), and filed its Answer (ECF No. 8). On January 30, 2023, EDU and MP Copiers filed the instant Cross Motions for Summary Judgment (ECF Nos. 53, 54, respectively). They filed Responses in Opposition on February 13, 2023 (ECF Nos. 55, 56) and Replies on February 27, 2023 (ECF Nos. 57, 58).

## II. DISCUSSION

### A. Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–

87 (1986). The nonmovant "must set forth specific facts, either by affidavit or other evidentiary showing, demonstrating a genuine dispute for trial." Sanchez Carrera v. EMD Sales, Inc., 402 F.Supp.3d 128, 144 (D.Md. 2019). The nonmovant "cannot create a genuine dispute of material fact through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008). A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248.

If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (quoting Fed.R.Civ.P. 56(c)). Thus, summary judgment is warranted if the nonmovant does not provide evidence to establish an essential element of the case. Brocious v. U.S. Steel Corp., 429 F.Supp.3d 82, 86 (D.Md. 2019).

B.     **Analysis**

1.     **Breach of Contract**

EDU seeks partial summary judgment on the issue of MP Copiers' liability on the breach of contract claim.[2] (See Pl.'s Mot. Summ. J. ["EDU's Mot."] at 14, ECF No. 53). It argues that MP Copiers breached the Agreement when it failed to pay commissions. (Id. at 17). MP Copiers first contends that EDU's claim is barred by the statute of limitations. (Def.'s Mot. Summ. J. ["MP Copiers' Mot."] at 4, ECF No. 54).

The parties disagree about whether Virginia's five-year statute of limitations or Maryland's three-year statute of limitations applies. (Id. at 4; Opp'n MP Copiers' Mot. at 5, ECF No. 55). This Court looks to Maryland's choice of law rules, because "[a] federal court sitting in diversity applies the conflict of law rules of the state in which it sits." Est. of Alvarez v. Johns Hopkins Univ., 275 F.Supp.3d 670, 706 (D.Md. 2017). Under Maryland law, courts apply the substantive law of the state in which the contact was formed, State Auto. Mut. Ins. Co. v. Lennox, 422 F.Supp.3d 948, 961 (D.Md. 2019), which the parties agree is Virginia. (See Opp'n EDU Mot. at 5). However, this rule applies only to substantive matters and "Maryland law requires that procedural matters are governed by Maryland law." Johnson-Howard v. AECOM Special Missions Servs., Inc., 434 F.Supp.3d 359, 371 (D.Md. 2020). Generally, Maryland courts view issues related to the statute of limitations as procedural, not substantive. Id. "The only exception to this rule under Maryland law is when the expiration of the statute of limitations period contained in the

---

[2] EDU alleges that the calculation of damages is complex and best left to subsequent briefing after a determination of liability. (EDU's Mot. at 24).

law of a forum state would terminate a plaintiff's right to maintain an action initiated pursuant to a foreign statute." Id. The exception does not apply here because EDU's breach of contact claim is a common law claim, not a statutory one. (See Compl. ¶¶ 5−14). Accordingly, Maryland's three-year statute of limitations applies. See Md. Code Ann., Cts. & Jud. Proc., § 5–101.

Next, the Court must determine when the statute of limitations began to accrue. Under Maryland law, a breach of contract action begins to accrue when the contract is breached. Lennox, 422 F.Supp.3d at 963. MP Copiers argues that any alleged breach occurred in 2016, and that EDU's claim is therefore barred because it did not file the Complaint until February 4, 2020, more than three years later. (MP Copiers' Mot. at 4). Specifically, MP Copiers contends that the parties agreed to monthly payments of at least $10,000, and that when MP Copiers missed several payments or paid less than that amount in 2016, (see Spreadsheet at 5), it breached the contract. (MP Copiers' Mot. at 4−5). EDU argues that MP Copiers acknowledged its debt and promised to pay in 2016 (see Mar. 2, 2016 Email at 3 (proposing incremental payments towards the $240,000 balance)), and therefore that the statute of limitations was extended and no breach occurred until January 30, 2018 when MP Copiers unequivocally repudiated its obligations under the Agreement. (Opp'n MP Copiers' Mot. at 7 (citing Jan. 30, 2018 Email at 2)). At bottom, the Court agrees with EDU.

"Maryland law has long recognized that an acknowledgment of a debt barred by the statute of limitations removes the bar and revives the remedy." Columbia Ass'n, Inc. v. Poteet, 23 A.3d 308, 320 (Md.Ct.Spec.App. 2011). Maryland courts have explained that

9

statutes of limitations were "never intended to prevent the recovery of debts really due, but to protect persons from old claims when the evidence of their discharge, from length of time was supposed to have been lost." Id. Here, although MP Copiers missed payments in 2016, it also acknowledged its debt in Yingling's March 2, 2016 email, where he proposed making incremental payments towards the $236,312 balance. (Mar. 2, 2016 Email at 3). MP Copiers then made sporadic payments until September 21, 2017, and it finally repudiated the Agreement on January 30, 2018. (See Jan. 30, 2018 Email at 2). The Court finds that the acknowledgment of the debt and the subsequent payments extended the statute of limitations for EDU's claim, which did not begin to run until January 30, 2018. Accordingly, the three-year statute of limitations did not expire until 2021 and EDU's February 4, 2020 breach of contract claim is not time-barred.

The Court now turns to the substance of EDU's claim, which is governed by Virginia law, as explained above. In Virginia, the elements of breach of contract are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Henderson v. Fairfax-Falls Church Commnity Serv. Bd., No. 1:18-CV-825, 2018 WL 6037522, at *4 (E.D.Va. Nov. 15, 2018), aff'd sub nom. Henderson v. Fairfax-Falls Church Cmty. Servs. Bd., 771 F.App'x 205 (4th Cir. 2019).

MP Copiers argues that there is a dispute of material fact regarding the first element because EDU does not have the right to enforce the Agreement, and the Agreement does not apply to the Inova account. (Opp'n EDU's Mot. at 12−13, ECF No. 56). The Court

finds that EDU does have the right to enforce the Agreement, but there is a dispute of material fact as to whether the Agreement applies to the Inova account.

First, MP Copiers argues that EDU cannot enforce the Agreement because the 2008 Vendor Contracts Agreement applied only to Krutoy and Boomer as individuals. (Id. at 12). MP Copiers contends that language referring to Krutoy as the "sole owner" of his contracts and Boomer's purchase of those contracts "in his own name" establishes that the Vendor Contracts Agreement does not apply to EDU. (Id. (citing Vendor Contracts Agreement ¶¶ 4(a), 5(a)). The Court is unconvinced because the Vendor Contracts Agreements' opening paragraph identifies Krutoy and Boomer as the parties and states that "[a]ny reference hereinafter to either of the above parties shall include their heirs and assigns, and any entity which they control or in which they have an ownership interest." (Vendor Contracts Agreement at 1). The earlier Agreement makes it clear that it applies to "heirs, successors, and assigns" of MP Copiers and EDU, (Agreement at 3), and the Vendor Contracts Agreement established D3 as EDU's successor, (Vendor Contracts Agreement at 1). Accordingly, EDU is entitled to enforce the agreement.

Second, MP Copiers argues that there is a genuine dispute of material fact as to whether the Agreement applies to the Inova account because of inconsistencies in the Agreement's pricing and billing terms and that there is a separate, oral agreement that applies to the Inova account. (Opp'n EDU Mot. at 13). Regarding the pricing, the Agreement provides that profits and commissions would "be calculated using published Summit Level or GEM Level pricing, as applicable." (Agreement ¶ 1). According to MP Copiers, this pricing "was a specific term applicable only to the manufacturer Toshiba"

11

and MP Copiers ceased serving as a Toshiba dealer in 2009. (Opp'n EDU Mot. at 13 (citing Boomer Dep Vol. 4 at 38:14−21, ECF No. 56-1)). Therefore, the calculation of profits as to other manufacturers falls outside of the Agreement's scope. (Id.). Further, the Agreement required service commissions to be paid quarterly, (Agreement ¶ 2), and Inova was only billed annually for servicing, (Boomer Dep. Vol. 4 at 56:11−21; 79:13−18). Although EDU counters that the Agreement applies broadly to "all deals sold by Elliot and his crew," (EDU's Reply EDU's Mot. at 8, ECF No. 57), the Court finds that these issues create a genuine dispute of material fact and that a jury must determine whether the Agreement applies to the Inova account.

Additionally, MP Copiers argues that it had a separate, oral agreement with Kutroy allowing him to manage the Inova account and receive 14% servicing commissions only if he met the $800,000 quota. (See Opp'n EDU Mot. at 13 (citing Yingling Dep. Vol. 1 at 126:6−15). EDU argues that this alleged agreement is unenforceable under the statute of frauds because it relates to the sale of over $500 in goods, and the contract could not be performed within a year. (EDU Mot. at 22 (citing Va. Code Ann. § 8.2-201, § 11-2)). The Court disagrees. EDU and MP Copiers did not contract to exchange goods but rather brokering and management services. Although EDU sold goods to customers, there was no exchange of goods between the parties of this lawsuit—rather, EDU agreed to broker sales and manage customer accounts in exchange for commissions. (See Agreement at 1−3). The statute of frauds does not apply to such contracts for services. See Ocean 10 Sec. LLC v. Lynchburg Redevelopment & Hous. Auth., No. 6:22-CV-7, 2022 WL 1272012, at *2 (W.D.Va. Apr. 28, 2022) (finding that the statute of frauds did not apply when the contract

was "primarily for services"). As to the year provision of the statute of frauds, the Court notes that the evidence regarding the oral agreement does not specify a timeframe for performance, and it is unclear whether the agreement could be performed within a year. Accordingly, the Court will not find that the oral contract is unenforceable as a matter of law.

EDU also argues that any evidence of the alleged oral agreement would be inadmissible under the parol evidence rule. (EDU's Mot. at 20). The parol evidence rule, also known as the "plain meaning rule," provides that when the parties have reduced their agreement to a clear, unambiguous writing, evidence of prior or contemporaneous agreements that contradicts the contract's terms is inadmissible. Worsham v. Worsham, 867 S.E.2d 63, 70 (Va.App. 2022). Although MP Copiers does not address this issue in its briefing, the evidence in the record does not conclusively show when the oral agreement was made, and thus it is unclear whether the parol evidence rule applies. The Court notes that the evidence supporting an alleged separate agreement is thin—only Yingling's Deposition and his mention of the quota in the 2016 Email support this theory. Nevertheless, this oral agreement, combined with the pricing and payment schedule discrepancies in the Agreement, create a genuine dispute of material fact regarding whether the Agreement applies to the Inova account.

Accordingly, the Court will deny the Motions for Summary Judgment as to the breach of contract claim.

### 2. Quantum Meruit and Unjust Enrichment

Quantum meruit and unjust enrichment are quasi contract remedies. See T. Musgrove Constr. Co. v. Young, 840 S.E.2d 337, 341 (Va. 2020). Quantum meruit is "[w]here service is performed by one, at the instance and request of another, and . . . nothing is said between the parties as to compensation for such service, the law implies a contract, that the party who performs the service shall be paid a reasonable compensation therefor." Id. As for unjust enrichment, the elements are: (1) "plaintiff conferred a benefit on defendant; (2) defendant knew of the benefit and should reasonably have expected to repay plaintiff; and (3) defendant accepted or retained the benefit without paying for its value. Id.

Virginia courts have distinguished the two claims as follows:

> [A] plaintiff can recover based on quantum meruit when the plaintiff completes work at the defendant's request, but the parties do not agree on the proper compensation for those services. On the other hand, when the defendant has not requested the plaintiff's services, a plaintiff's claim is for unjust enrichment.

Monogram Snacks Martinsville, LLC v. Wilde Brands, Inc., No. 4:20-CV-00030, 2022 WL 188188, at *6 (W.D.Va. Jan. 20, 2022) (cleaned up) (citing T. Musgrove Constr. Co., 840 S.E.2d at 341).

Here, the record shows that EDU provided services at MP Copiers' request. (See Yingling Dep. Vol. 2 at 127:19−128:21 (describing working relationship between EDU and MP Copiers). Thus, a reasonable jury could not find for EDU on the unjust enrichment claim, and the Court will grant MP Copiers' Motion for summary judgment on that claim.

14

As for quantum meruit, the Court cannot decide this claim without first determining if MP Copiers is liable for breach of contract. See Centex Constr. v. Acstar Ins. Co., 448 F.Supp.2d 697, 707 (E.D.Va. 2006) ("Virginia law provides no relief under a quantum meruit theory where a valid, express contract exists between the parties."). Accordingly, because the breach of contract claim remains unresolved, the Court will deny the Motions for Summary Judgment as to the quantum meruit claim.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant MP Copiers' Motion for Summary Judgment as to the unjust enrichment claim and deny the Motion in all other respects. The Court will also deny EDU's Motion for Summary Judgment. A separate Order follows. Entered this 31st day of August, 2021.

                                                        /s/
                                     George L. Russell, III
                                     United States District Judge